IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| PSP FRANCHISING, LLC,<br>*Plaintiff* | § § § § | |
| -vs- | § § | SA-25-CV-00544-XR |
| SUREFED PLUS, LC, WILLIAM W. VERNON JR., WILLIAM W. VERNON SR., KATHERINE BARKSDALE, DAVID BARKSDALE,<br>*Defendants* | § § § § § § | |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

On this date, the Court considered Plaintiff PSP Franchising, LLC's motion for a temporary restraining order and, thereafter, a preliminary injunction (ECF No. 3) enjoining Defendants from breaching their covenants not to compete and infringing Plaintiff's proprietary marks; Defendants' response (ECF No. 8); Plaintiff's reply (ECF No. 10); and the parties' arguments at the hearing held on May 29, 2025. After careful consideration, the Court issues the following order.

## BACKGROUND

`       Plaintiff PSP Franchising, LLC ("Pet Supplies Plus", "PSP", or "Franchisor") initiated this action against a former franchisee, Defendant SureFed Plus, LC ("SureFed" or "Franchisee"), and four individuals (the "Guarantors")[1] for breach of contract and trademark infringement in violation of the Lanham Act. *See* ECF No. 1. PSP alleges that SureFed has violated its post-termination obligations under a franchise agreement with PSP by operating a competing pet supply store at the former franchise location in San Antonio, and continuing to use PSP's proprietary marks and confidential information.

---

[1] For the purposes of this order, "Defendants" refers to Surefed, David Barksdale, Katherine Barksdale, and William W. Vernon *Sr.*, but excludes William W. Vernon *Jr.*, who is not represented by Luther Lanard, PC.

I. **PSP's Products and System**[2]

Founded in 1988, Pet Supplies Plus has grown to be one of the nation's largest specialty pet food retailers, with 700 stores across the United States and 80 in Texas alone. In addition to carrying an extensive selection of name brand pet food and products, PSP has developed its own line of private label products, including proprietary pet food lines (such as Redford Naturals and Mitten's Morsels) and pet supply lines (such as PlayOn! and Fins First). ECF No. 1 ¶ 13. PSP asserts that consumers have come to associate these products with PSP and its stores. *Id.*

Over its more than 30 years of franchising and operating pet supply stores, PSP has also developed a comprehensive set of practices and procedures known as Standard Operating Procedures ("SOPs"). ECF No. 3-1, Declaration of Kenneth Miles Tedder ("Tedder Decl.") ¶ 3.

The SOPs encompass every aspect and function of operating a Pet Supplies Plus store, including inventory management, marketing, employee training suggestions, customer service, merchandising, and safety protocols. *Id.* The SOPs are one component of a larger system (the "System"), which includes:

(a) uniform standards and specifications for providing pet products and self-service pet washing and grooming services for retail sale;
(b) access to PSP's supplier networks;
(c) specifications for a Store's interior and exterior construction, design, and layout;
(d) specifications for furniture, fixtures, and equipment;
(e) sales techniques;
(f) merchandising, marketing, advertising, and inventory management systems; and
(g) other general procedures for operating and managing a retail Store.

ECF No. 3-1, Ex. A-1, Recital C.

---

[2] Unless otherwise noted, these allegations are drawn from PSP's complaint and attachments to its motion.

2

PSP's System also includes the federally registered trademarks listed below ("Proprietary Marks"), which PSP owns and uses to identify its stores, pet food products, supplies, and services.

| Mark | Reg. No./Date | Mark | Reg. No./Date |
|---|---|---|---|
| PET SUPPLIES PLUS | 6615240 1/11/2022 | **FINS FIRST** (Non-Stylized) | 7450937 7/16/2024 |
| PET SUPPLIES PLUS | 6615317 1/11/2022 | **HARTWICK FIELDS** (Non-Stylized) | 6816280 8/9/2022 |
| PET SUPPLIES PLUS | 1712087 9/1/1992 | HARTWICK · FIELDS · | 6816465 8/9/2022 |
| PET SUPPLIES "PLUS" | 1708560 8/18/1992 | **MINUS THE HASSLE** | 5487103 6/5/2018 |
| Play On. | 6075789 6/9/2020 | M (cat logo) | 5869943 9/24/2019 |
| **PLAY ON** (Non-Stylized) | 7450936 7/16/2024 | M (cat logo with seal) | 5869942 9/24/2019 |
| REDFORD NATURALS | 5014577 8/2/2016 | **MITTEN'S MORSELS** (Non-Stylized) | 5863706 9/17/2019 |
| **REDFORD NATURALS** (Non-Stylized) | 5004745 7/19/2016 | **MITTEN'S PICKINS** (Non-Stylized) | 6804976 7/26/2022 |
| **WIXOM RANCH NATURAL CHEWS** (Non-Stylized) | 7733102 3/18/2025 | **OPTIMPLUS** (Non-Stylized) | 6816405 8/9/2022 |
| **FINS FIRST** (Non-Stylized) | 7127570 8/1/2023 | | |

*See* ECF No. 1-3 (True and correct copies of these registration certificates, obtained from the Trademark Electronic Search System database of the United States Patent and Trademark Office).

**II.     Franchisee David Barksdale's Experience in Animal Food and Supplies**

Defendant David Barksdale, the Chief Executive Officer of SureFed, has worked in the animal food and supply industry since the 1990s. ECF No. 8-1, Declaration of David Barksdale ("Barksdale Decl.") ¶¶ 2–3. Long before he and his wife and in-laws became PSP franchisees in 2015, Mr. Barksdale owned and operated an animal and pet feed mill, where he manufactured, distributed and sold at a retail level various pet and animal foods and related products. *Id.* ¶¶ 3–9.

3

While operating the feed mill, Mr. Barksdale not only manufactured feed and sold ingredients to several pet food manufacturers but sold products directly from his store, including pet food, pet treats, cattle and farm-animal feed, and animal medications and vaccines. *Id.* ¶¶ 3–4. Mr. Barksdale formed relationships with several manufacturers and distributors of pet food and animal products as he built his business, which he ultimately sold in 2014. *Id.* ¶¶ 5–9.

**III.  The Franchise and Guaranty Agreements**

In April 2015, PSP and SureFed entered into a ten-year franchising agreement ("Franchise Agreement") under which Defendants opened a Pet Supplies Plus store located at 5809 Babcock Road in San Antonio, Texas ("San Antonio store" or "San Antonio location"). *See* ECF No. 3-1, Ex. A-1.[3] On the same day, the Guarantors personally agreed to be jointly and severally bound to the terms of the Franchise Agreement. *Id.* at 63–64.

Under the Franchise Agreement, PSP granted Defendants a non-exclusive license to establish and operate one Pet Supplies Plus store under PSP's System. *See id.* § 1.1. Defendants were also granted an exclusive territory: the area within a two-mile radius of the San Antonio store (the "Territory"). *Id.* § 1.2.

The Franchise Agreement gave Defendants the right to use PSP's Proprietary Marks, service marks, trade dress, logos, and other indicia of origin and access to PSP's confidential and trade secret information ("Confidential Information"), including the SOPs, referred to in the Franchise Agreement as the "Operations Manual." *See id.* § 8.1.[4] PSP also provided Defendants

---

[3] Just over a year later, Defendants entered a separate agreement with PSP to open a second Pet Supplies store at 12407 N Mopac Expressway, Suite 525-B, Austin, Texas 78758 ("Austin location").

[4] "Confidential Information" includes "trade secrets, advertising strategies, price marketing mixes related to products and services offered by Stores, supplier networks and pricing arrangements with suppliers, sales promotion aids, business forms, merchandising procedures, accounting procedures, marketing reports, inventory systems, copyrighted materials, and other methods, techniques and know-how concerning the operation of the Store . . . including (i) current customer and prospective customer names and addresses, (ii) information about credit extensions to customers, (iii)°customer purchasing histories, (iv) rates charged to customers, and (v) CRM reports."

4

with such Confidential Information during various franchisee meetings hosted by PSP addressing business strategies, market analytics, and competitive planning materials. ECF No. 3-1, Tedder Decl. ¶ 10. PSP's Confidential Information, was shared and discussed with Defendants at PSP's Leadership Summit, Quarterly Business and Marketing Calls, Franchisee Advisory Committee sessions, and regular meetings with SureFed's assigned District Team Leader. *See id.* A key purpose of the meetings was to equip franchisees like SureFed with tools and strategies for gaining market share based on PSP's Confidential Information. *See id.*

In exchange for its access to PSP's System, Proprietary Marks, and Confidential Information, Defendants agreed to certain restrictions on competition following the termination of franchise relationship, set forth in Article XI of the Franchise Agreement.

**Section 11.1 Restrictions on Competition**

(b)  **For a period of 2 years after the expiration, nonrenewal, transfer or termination of this Agreement**, regardless of the cause, **neither you nor your owners, officers, directors, principals**, Key Managers, nor any member of your immediate family or the immediate family of your owners, officers, directors, principals, and Key Managers who work at the business **may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation**:

    (1)  Enter into any business competing in whole or in part with PSP by granting franchises or licenses for business which derive 20% or more of their revenues from the sale of pet food, toys, accessories, supplies, grooming products, pet bathing or grooming services, or other products or services offered or authorized for sale by System franchisees at the time this Agreement is terminated or otherwise expires and is not renewed;

    (2)  Own, maintain, engage in, be employed as an officer, director, or principal of, lend money to, extend credit to or have any interest in any other business or entity which operates or licenses others to **operate a business that derives 20% or more of its revenue from the sale of pet food, pet supplies, pets, pet grooming and bathing services, and any other products or**

>>**services offered or authorized by PSP for sale by System franchisees** at the time this Agreement is terminated or otherwise expires and is not renewed: (i) **at the [San Antonio] Location premises**; (ii) within the Territory; or (iii) within a 5-mile radius of (a) the Territory being granted hereunder or (b) any other Territory licensed by PSP as of the date of expiration or termination of this Agreement;
>
> (3) Solicit the Store's customers or contact any of PSP's suppliers or vendors for any competitive business purpose; or
>
> (4) Employ or seek to employ any person who is at that time employed by PSP or its affiliates or any other franchisees, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat.

*See* ECF No. 3-1 § 11.1 (emphasis added). Further, Section 11.5 of the Franchise Agreement includes a conclusive presumption that if Defendants operate a business that derives 20% or more of its revenue from pets and pet-supplies-related products and services in the restricted area, then it is presumed that Defendants are using PSP's Confidential Information. *Id.* § 11.5.

In agreeing to Article XI's restrictions on competition, SureFed acknowledged that such covenants were necessary to "protect the goodwill of the Store, other Pet Supplies Plus franchisees, and the Pet Plus System" and the Confidential Information provided to SureFed under the Franchise Agreement. *Id.* § 11.2. SureFed further acknowledged that "in the event of the actual or threatened breach of this Section 11, PSP's harm will be irreparable and that PSP has no adequate remedy at law to prevent such harm." *Id.* SureFed also agreed to "[i]mmediately discontinue use of the Proprietary Marks" upon expiration of the Franchise Agreement. *Id.* § 13.7(c).

The Guarantors likewise agreed that they would not breach any post-termination obligation arising under the Franchise Agreement. ECF No. 3-1, Ex. A-1 at 62–67. The Guaranty Agreement contained identical covenants against competition. *Id.* at 63–64.

### IV. Termination of Franchise Agreement, Expiration Notice, and PSP Bankruptcy

In March 2025, SureFed informed PSP that it was not interested in renewing the Franchise Agreement for the San Antonio store. *See* ECF No. 3-1, Ex. A-2 at 1 ("Expiration Notice"). SureFed asserts that there were "serious operational challenges" throughout its relationship with PSP, including PSP's repeated, targeted store audits that disrupted operations and its failure to deliver key products to Defendants' stores. *See* ECF No. 8-1, Barksdale Decl. ¶ 24.

Indeed, despite Mr. Barksdale's intention to sell his previous business and operate the franchise locations to provide income for his retirement, *see* ECF No. 8-1, Barksdale Decl. ¶ 9, Defendants characterize their PSP businesses as "nothing more than a money pit," ECF No. 8 at 4. Between 2015 and 2016, Mr. Barksdale developed four PSP locations: three in San Antonio and one in Austin, which opened in January 2017. ECF No. 8-1, Barksdale Decl. ¶ 13. He also purchased the rights to develop an additional 14 locations in Texas. *Id.* ¶ 12. After operating the stores at net loss for some time, however, Mr. Barksdale came to believe that the financial forecasts in PSP's franchise disclosures were misleading—underestimating the required initial investment and overestimating expected revenue. *See id.* ¶¶ 11, 14, 16–18. In 2017, he closed two of the San Antonio stores (after several unsuccessful attempts to sell them) and returned his remaining development rights to PSP. *See id.* ¶¶ 20–22. .

The Franchisees' operational challenges were only exacerbated by PSP's Chapter 11 bankruptcy filing in November 2024. *See* ECF No. 8 at 4. The first filing in the bankruptcy proceeding identifies several key pet food suppliers (including Purina and Hill's Science Diet) as unsecured creditors holding the largest claims against PSP's parent company, Franchise Group, and other debtors. *See* ECF No. 8, Ex. A at 7.

In spring 2025, the parties began discussing post-expiration options, including a possible sale of the San Antonio franchise and assumption of the lease—to PSP or an outside buyer. *See* ECF No. 8-1, Barksdale Decl. ¶¶ 28–32; ECF No. 10 at 18. After several months without an agreement, PSP issued an Expiration Notice stating that it would cease performance under the expired Franchise Agreement on May 8, 2025. ECF No. 3-1, Teddler Decl. ¶ 8. The Expiration Notice also memorialized the consequences of termination, reminding Defendants of their post-termination covenants, including non-competition and confidentiality, and directing SureFed to immediately discontinue use of PSP's Proprietary Marks. *Id.* The Expiration Notice set forth a June 5, 2025 deadline for Defendants to de-identify their San Antonio store. *Id.* at 2.

### V.   PSP's Post-Termination Store Visit

On May 11, 2025, Alcides Segovia, a PSP District Team Leader, visited the San Antonio store and observed that, despite the Expiration Notice, Defendants were continuing to operate a pet supply store. ECF No. 3-2, Segovia Decl. ¶¶ 7–8. The "Pet Supplies Plus" sign was still displayed on the building façade, without any indication to customers that the store was no longer a PSP franchise. *Id.* ¶¶ 8–9; *see id.*, Ex. B-1 (photo of façade). Defendants were continuing to use and display PSP's proprietary branded materials, including signage and window dressings with PSP trademarks, and continued to sell PSP private-label pet food and supplies. *Id.* ¶¶ 8–9 (noting "Pet Supplies Plus" and "Minus the hassle" signage); *id.* ¶ 11 (noting private brand merchandise on shelves, including products from FinsFirst, Hartwick Fields, Mitten's Morsels, Mitten's Pickins, OptimPlus, PlayOn!, Redford Naturals, and Wixom Ranch); *see id.*, Ex. B-2 (photo of signage); Ex. B-5 (receipt for Redford Naturals cat food). The store was selling only pets, pet foods, and pet supplies and did not offer any goods or services unrelated to pets. *See id.* ¶ 17.

8

During his visit, Mr. Segovia noticed several violations of the SOPs, including multiple empty racks and displays ("product holes") and dead fish in aquariums. *Id.* ¶¶ 10, 12; *see id.*, Exs. B-3, B-4 (photos of product holes). While waiting in line to purchase a can of Redford Naturals cat food, Mr. Segovia overheard customers complaining that they could not use their Pet Supplies Plus Rewards, PSP's customer loyalty program. *Id.* ¶ 13. At checkout, customers were presented with a flier stating "We're Having A Makeover" with a QR code that linked to a Google document soliciting customer information, product preferences, and contact details *Id.* ¶ 15; *see id.*, Ex. B-6 (Google form). After making a purchase, Segovia was given a receipt with the store name "Pets Plus". *Id.* ¶ 14; *see id.*, Ex. B-5 (receipt).

## VI.  Procedural History

PSP filed its original complaint on May 16, 2025, alleging that Defendants' conduct constitutes a material breach of the Franchise and Guaranty Agreements and willful trademark infringement under the Lanham Act. ECF No. 1. On the same date, PSP moved for emergency injunctive relief to prevent harm to its brand, reputation, and customer goodwill. ECF No. 3.

Defendants filed a response on May 29, 2025 (ECF No. 8), shortly before the Court's hearing. At the hearing, Defendants represented that the San Antonio store had been timely de-identified in accordance with the terms of the Expiration Notice—the store was no longer using or displaying PSP's proprietary branded materials, including signage or window dressings with PSP trademarks, or selling PSP private-label pet food and supplies. *See* ECF No. 8 at 2, 6–9 (explaining that the store was timely de-identified by May 19, 2025); ECF No. 8-1, Barksdale Decl. ¶¶ 41–43.[5] Defendants also explained that the store had lost access to Plaintiff's customer lists and other Confidential Information on the Expiration Date. *See* ECF No. 8 at 14.

---

[5] PSP filed suit on May 16, 2025—well before the June 5 de-identification deadline. *See* ECF No. 1.

Because injunctive relief as to use of PSP's Proprietary Marks or customer lists would not prejudice Defendants, the Court issued an order from the bench enjoining Defendants from (1) using Plaintiff's Proprietary Marks or (2) using any customer lists prepared or maintained while the Franchise and Guaranty Agreements were in effect. *See* Text Order (June 3, 2025). The Court further directed Defendants to return to Plaintiff any electronic or hard copy versions of the SOPs, pricing sheets, market research, or other Confidential Information bearing on the San Antonio store received from Plaintiff while the Franchise and Guaranty Agreements were in effect. *See id.* The Court took under advisement Plaintiff's remaining requests for injunctive relief pending receipt of Plaintiff's reply brief, which was filed on June 9, 2025. *See* ECF No. 10.

## DISCUSSION

**I.      Legal Standard**

The factors that govern an application for a temporary restraining order are the same as those that govern a request for preliminary injunction. *Hill v. Green Cnty. Sch. Dist.*, 848 F. Supp. 697, 703 (S.D. Miss. 1994) (citing *Canal Authority of State of Fl. v. Callaway*, 489 F.2d 567 (5th Cir.1974)).

Under well-settled Fifth Circuit precedent, a preliminary injunction requires the movant to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

To determine the likelihood of success on the merits, the Court looks to the standards provided by the substantive law. *See Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir.1985). The substantive prerequisites for obtaining an equitable remedy as

well as the general availability of injunctive relief are not altered by Rule 65 and depend on traditional principles of equity jurisdiction. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999).

## II. Analysis

### A. Likelihood of Success on the Merits

PSP has a high likelihood of succeeding on the merits of its breach-of-contract claim because, despite the expiration of the Franchise Agreement, Defendants have continued to operate a pet supply store at the San Antonio store, in violation of their non-compete and post-termination obligations under the Franchise and Guaranty Agreements.

Under Michigan law,[6] a party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a valid and enforceable contract, (2) which the other party breached, (3) thereby resulting in damages to the party claiming breach. *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).

PSP has adequately alleged and proffered sufficient documentary evidence in support of each element of its breach-of-contract claims.

#### 1. Validity and enforceability of the non-compete

First, PSP and Defendants entered into valid and enforceable contracts in April 2015. *See* ECF No. 3-1, Ex. A-1. The Franchise and Guaranty Agreements require Defendants to comply with certain obligations following termination of the Franchise Agreement including (1) not operating a pet supply store within the restricted area for a period of two years and (2) immediately discontinuing the use of PSP's Proprietary Marks. *See* ECF No. 3-1, Ex. A-1 §§ 11.1(b), 13.7(c); *id.* at 63–64.

---

[6]The Franchise Agreement included a Michigan choice of law clause. ECF No. 3-1, Ex. A-1 § 16.1.

Defendants' post-termination obligations are likely enforceable, at least to some degree. Non-compete agreements in the business-to-business context are "evaluated under the rule of reason." *Innovation Ventures, LLC v. Custom Nutrition Labs, LLC*, 912 F.3d 316, 340 (6th Cir. 2018) (quoting *Innovation Ventures, LLC v. Liquid Mfg., LLC*, 499 Mich. 491, 514 (2016)). "When applying the rule of reason, a court must 'tak[e] into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.'" *Innovation Venture*, 499 Mich. at 514 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).

The parties dispute whether the non-compete provisions are reasonable. PSP asserts that the covenants against competition are reasonable because they are limited in time to two years post-termination and protect its Confidential Information disclosed during the term of the Franchise Agreement. ECF No. 3 at 17.[7]

Defendants challenge the non-compete provisions as overbroad—in multiple respects— and unreasonably vague. ECF No. 8 at 10–11. They point out that the non-compete provisions purport to prevent individuals who are not parties to either contract and never received PSP's confidential information (e.g., family members of the signatories) from even investing in or lending money to a business derives 20% or more of its revenue from the sale of pet-related supplies and services. *See id.*; *see also* ECF No. 3-1 § 11.1. Alongside these hypothetical scenarios,[8] however, Defendants assert that the non-compete is unreasonable because it prevents

---

[7] *See Midfield Concession Enters. v. Areas USA, Inc.*, 130 F. Supp. 3d 1122, 1140 (E.D. Mich. 2015) (Michigan courts "have upheld [non-compete agreements] ranging from six months to five years.") (collecting cases); *see also id.* ("Under Michigan law, preventing the anticompetitive use of confidential information is a legitimate business interest."); *see also* ECF No. 3-1, A-1 § 11.5 (conclusive presumption that any Defendant operating a competing business in violation of the non-compete is using PSP's Confidential Information in such business).

[8] As PSP accurately notes many of Defendants' enforceability arguments are based on hypothetical scenarios, not the facts now before the Court. PSP is not, for example, attempting to enforce the contracts against non-signatories to prohibit a *de minimis* investment in a competing business; it seeks to prohibit *the actual signatories* to the contracts

12

Mr. Barksdale from engaging in the same line of business with business partners he developed for over 20 years before becoming a PSP franchisee. *See* ECF No. 8 at 9–10; *Innovation Venture*, 499 Mich. at 514 (only information acquired *after* the parties entered the contract was protectable and subject to confidentiality).

Even assuming that the non-compete is overbroad to some degree, Michigan law counsels that the courts should enforce non-compete agreements to the extent that they are reasonable. *See Sawicki v. Resolute Indus., LLC*, No. 22-10648, 2024 WL 4525299, at *27 (E.D. Mich. Aug. 22, 2024) ("[W]hile the court has the authority to invalidate the non-compete provision as a whole, it also has the authority to re-write the provision to limit the agreement to render it reasonable in light of the circumstances and then specifically enforce the agreement as limited.") (cleaned up).

### 2. Defendants' breach of the non-compete

Turning to the second element of PSP's breach-of-contract claim, Defendants' post-termination actions show that they have breached their reasonable covenants not to compete by operating a pet supply store at the prior San Antonio location, in direct violation of the Franchise and Guaranty Agreements. *See* ECF No. 3-1, Ex. A-1 § 11.1(b)(2) (SureFed's covenant not to compete by owning, maintaining, and/or engaging in a business that derives 20% or more of its revenue from the sale of pet-related products and services); *id.* at 63 (Guarantor covenants). While PSP asserts that the "store sells only pets, pet foods, and pet supplies and does not offer any merchandise or services unrelated to pets," ECF No. 3-2, Segovia Decl. ¶ 17, Mr. Barksdale has represented that he intends to start selling farm-animal products, including chicken feed, cattle feed, and farm-animal medications—products that PSP does not offer and would not allow him to

---

from *operating* a competing business. *Cf.* ECF No. 10 at 6–7; *see also Smoothie King Franchises, Inc. v. UKE-MEX Enters., Inc.*, No. 4:10-CV-1285, 2010 WL 11679368, at *2 (S.D. Tex. Sept. 17, 2010), *report and recommendation adopted*, No. CV H-10-1285, 2010 WL 11679369 (S.D. Tex. Oct. 20, 2010) ("The court will not address, hypothetically, whether the agreement would be overbroad as to any other geographic location.").

13

stock under the Franchise Agreement, ECF No. 8-1, Barksdale Decl. ¶¶ 65, 66, 69. Thus, it is not clear what portion of the San Antonio store's revenue is (or will be) attributable to the sale of pet supplies and/or services. Still, based on PSP's complaint and TRO submissions, it is very likely that PSP will be able to show that Defendants have breached their non-compete agreements at some point since the expiration of the Franchise Agreement.

### 3. Damages

Third, the Court is satisfied that PSP has suffered at least some economic damages due to Defendants' continued operation of a pet supply store at the San Antonio location in breach of their obligations under the Franchise and Guaranty Agreements.

In short, PSP has demonstrated a substantial likelihood of success on its breach-of-contract claims, even if its damages are ultimately limited by the anticipated changes to Defendants' business model and a narrower construction of the non-compete provisions.

### B. Irreparable Harm

"A court may only issue injunctive relief if irreparable harm is 'likely'; granting an injunction based on a mere possibility of remote injury is insufficient, even if a [movant] has shown a nearly certain likelihood of success." *Six Kingdoms Enters., LLC v. City of El Paso*, No. EP-10-CV-485-KC, 2011 WL 65864, at *9 (W.D. Tex. Jan. 10, 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

To establish irreparable harm, a party must demonstrate a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).

An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) ("[A] harm is irreparable where there is no adequate remedy at law, such as monetary damages.").

Courts have held that "a finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989) (quotation omitted); *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004) ("[A] plaintiff can prove there is no adequate remedy at law where damages cannot be calculated."). Injury to a party's reputation or goodwill is often considered an irreparable harm. *Doe v. Tex. Christian Univ. & Victor J. Boschini*, 601 F. Supp. 3d 78, 95 (N.D. Tex. 2022). On the other hand, courts have found that loss of market share, loss of future market opportunities, and loss of first-to-market opportunities do not constitute irreparable harm. *See, e.g.*, *Pruvit Ventures, Inc. v. Forevergreen Int'l, LLC*, No. 4:15-cv-571-ALM-CAN, 2015 WL 9876952, at *3 (E.D. Tex. Dec. 23, 2015).

Defendants have expressly acknowledged in their respective contracts that PSP has no adequate remedy for its breach of the non-compete.[9] That evidence alone does not fulfill PSP's burden on this prong, however, as such stipulations are "insufficient by themselves to support a finding of irreparable harm to support injunctive relief." *Hartford Fire Ins. Co. v. 3i Constr., LLC*, No. 3:16-CV-00992-M, 2017 WL 3209522, at *2 (N.D. Tex. May 18, 2017). Rather, PSP bears the burden of "demonstrat[ing] that monetary damages are an insufficient remedy and that their alleged harms are not just possible, but *likely*." *Pruvit Ventures*, 2015 WL 9876952, at *3.

---

[9] *See* ECF No. 3-1, Ex. A-1 § 11.2 ("You agree that in the event of the actual or threatened breach of this [non-compete], PSP's harm will be irreparable and that PSP has no adequate remedy at law to prevent such harm."); *id.* at 64 (same for Guarantors).

15

PSP alleges that Defendants' continued operation of a pet supplies store at the San Antonio location is creating confusion among PSP's past, current, and prospective customers and damaging the value of PSP's brand, goodwill, and reputation. ECF No. 3 at 23. Defendants assert that any confusion before the store was de-identified was caused by PSP itself, because it failed to remove the San Antonio location from its website, social media pages, and Google searches even after the termination of the Franchise Agreement. ECF No. 8 at 8–9; *see also id.*, Exs. C, D, E (screenshots of PSP's website, Google search results, and Instagram page listing the San Antonio location). PSP blames any customer confusion on the fact that the store was still operating. *See* ECF No. 10 at 10–11. But it is not clear to the Court how a website directing customers to a *closed* location would be better for PSP's reputation than directing customers to an *underperforming* location—either scenario would be confusing and frustrating for customers. In any event, arguments addressing customer confusion between termination on May 8 and de-identification on May 19 bear on questions of causation and damages and now moot as to PSP's request for emergency relief and otherwise premature. Now that the store has been fully de-identified from PSP, the risk of ongoing confusion among PSP's past, current, and prospective customers is quite low.

Similarly, PSP's fear that the Defendants' knowledge of and, through its Austin location continued access to the SOPs and Confidential Information will give them an unfair advantage in the San Antonio market seems unfounded, for several reasons.

To begin, the parties' disagreement about the value of the SOPs appears to have at least partially motivated Defendants' decision to terminate the Franchise Agreement. PSP acknowledges that "SureFed . . . often failed to follow PSP's SOPs," ECF No. 10 at 11, and David Barksdale insists that "over the years the PSP model has only cost [him] money," ECF No. 8-1, Barksdale Decl. ¶ 61. Mr. Barksdale intends to operate the San Antonio store "as differently as

possible from the PSP model" and, as previously discussed, plans to sell farm-animal supplies that PSP does not offer. *Id.* ¶¶ 64, 66–69.

Second, even to the extent that the San Antonio store continues to offer pet-related products, Defendants assert that the Confidential Information it has received will be of limited value. Some of the information designated in the contracts as "confidential" (e.g., accounting procedures) are simply not confidential in nature. ECF No. 8 at 14. Other items, such as advertising strategies and marketing reports "have a limited shelf-life," such that information Defendants received before the termination of the Franchise Agreement is obsolete. *Id.* And it is unlikely that Defendants could capitalize on their knowledge of PSP's pricing strategies to secure better prices from suppliers or offer better prices to customers, considering the superior bargaining power and economies of scale commanded by a company with 80 stores in Texas compared to a small, family-owned business.

More importantly, injuries caused by the misuse of PSP's confidential information are not only speculative but economic in nature. Defendants argue, persuasively, that monetary damages from their ongoing operations would be fairly easy to calculate given (1) the damages formula for breaches set forth in the Franchise Agreement, and (2) the parties' extensive financial records (including sales data) generated in their ten-year business relationship. *See* ECF No. 8 at 17–18.

Finally, PSP's fear that Defendants' operation of will likely be an animal supply store "will undermine the confidence of PSP's franchise network and impede PSP's efforts to recruit new franchisees into the San Antonio market" is speculative. ECF No. 3-1, Tedder Decl. ¶¶ 14, 18. PSP asserts that it has several current and prospective franchisees that are interest in opening locations in the San Antonio market, including a franchisee hoping to open three new stores in the area. ECF No. 10-1, Declaration of Nicholas Russo (PSP Chief Development and Stores Officer) ¶ 13. But

PSP primary complaint is that it has face difficulty finding suitable locations for new franchisees in San Antonio, and Defendants' decision to retain their lease at the San Antonio location has further limited its options. *See* ECF No. 10 at 14–16.

Otherwise, PSP's fear that new franchisees will be reluctant to enter the San Antonio market based on Defendants' purported advantage is in the pet supplies business is speculative, especially given Mr. Barksdale's plans to sell farm animal supplies. There are any number of business considerations that might make a putative franchisee reluctant to open a new PSP location, including, for example, the recent bankruptcy of PSP's parent company. PSP insists that the reorganization is immaterial because (1) Franchise Group emerged from bankruptcy in June 2025, and (2) PSP continued to grow its franchise business during the bankruptcy. *See* ECF No. 10 at 17. Again, this factual dispute will undoubtedly play a central role in discovery, but PSP has not, at this stage, met its burden of showing that damages would be insufficient relief for what is ultimately an economic injury. *See Pruvit Ventures*, 2015 WL 9876952, at *3 (loss of future market opportunities does not constitute irreparable harm).

In sum, given the de-identification of the store and existing injunction, the Court is not convinced at this stage that permitting Defendants to continue operating the San Antonio store is likely to cause PSP irreparable harm.

### C. Balance of Hardships

At this stage, the balance of hardships weighs against a temporary injunction based on the non-compete agreements.

Courts have recognized that the damage an injunction might cause a nonmoving party may be outweighed by the threat of an ineffective remedy for the plaintiff. *See, e.g.*, *BAC Home Loans Servicing, LP v. Tex. Realty Holdings, LLC*, No. H-09-2539, 2010 WL 3522981, at *13 (S.D. Tex.

July 6, 2010) (citing *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 687 (5th Cir. 1980)).

Requiring Defendants to cease operations will impose a substantial injury. *See Bennigan's Franchising Co., L.P. v. Swigonski*, No. CIVA 3:06CV2300G, 2007 WL 603370, at *5 (N.D. Tex. Feb. 27, 2007) ("If the plaintiffs' motion for injunctive relief is granted, the defendants will be forced to close the restaurant. This is a substantial injury.").

On the other hand, as the Court previously explained, PSP has not met its burden of showing, at this stage, that it is *likely* to suffer irreparable harm in the absence of an injunction. *See id.* ("Because the restaurant has been partially or completely decharacterized, because it does not use marks owned by Bennigan's in its operation, and because the nearest Bennigan's location is 210 miles away, there will be little or no injury to the plaintiffs if the restaurant is allowed to remain open.").

### D. Public Interest

Nor would a temporary restraining order enjoining Defendants' operations serve the public interest. While "[i]t is in the public interest to uphold contracts," *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 571 (S.D. Tex. 2014), an injunction would appear to disserve the public interest because it would close a local business and cost 17 employees their jobs. *See* ECF No. 8-1, Barksdale Decl. ¶ 54. *Bennigan's*, 2007 WL 603370, at *5 (finding that the public interest weighed *against* an injunction that prohibited the franchisees from operating or having any involvement with casual dining or other restaurant businesses in part because "the [defendant] restaurant would be forced to close and a number of employees would lose their jobs").

In sum, the Court finds that, while PSP is likely to succeed on its breach-of-contract claim to at least some degree, it has not established that it is likely to suffer irreparable harm if Defendants' operations are not enjoined.

## CONCLUSION

Plaintiff's application for a temporary restraining order (ECF No. 3) is **GRANTED IN PART** and **DENIED IN PART**, as described below, but **SHALL REMAIN OPEN** pending the Court's resolution of Plaintiff's motion for a preliminary injunction.

As previously stated in open court, Defendants are **ENJOINED** from (1) using Plaintiff's Proprietary Marks or (2) using any customer lists prepared or maintained while the Franchise and Guaranty Agreements were in effect.

Plaintiff's motion is otherwise denied in all respects without prejudice to re-urging at the preliminary injunction hearing set for November 12–13, 2025, at 9:00 a.m. in Courtroom H, United States Courthouse, 262 West Nueva, San Antonio, Texas 78207.

It is so **ORDERED**.

**SIGNED** this 20th day of October, 2025.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE