**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| PSP FRANCHISING, LLC,<br>*Plaintiff* | §<br>§<br>§<br>§ | |
| -vs- | §<br>§ | SA-25-CV-00544-XR |
| SUREFED PLUS, LC, WILLIAM W.<br>VERNON JR., WILLIAM W. VERNON<br>SR., KATHERINE BARKSDALE,<br>DAVID BARKSDALE,<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§ | |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

On this date, the Court considered Plaintiff PSP Franchising, LLC's motion for a preliminary injunction (ECF No. 3), the testimony and arguments at the hearing held on November 12 and 13, 2025, and the parties' post hearing briefing (ECF Nos. 45, 46). After careful consideration, the Court issues the following order.

## BACKGROUND

Plaintiff PSP Franchising, LLC ("PSP" or "Franchisor") initiated this action against Defendant SureFed Plus, LC ("SureFed" or "Franchisee"), and four individuals (the "Guarantors") for breach of contract and trademark infringement in violation of the Lanham Act. *See* ECF No. 1. PSP alleges that SureFed has violated its post-termination obligations under a franchise agreement with PSP by operating a competing pet supply store at the former franchise location in San Antonio and continuing to use PSP's proprietary marks and confidential information.

## I.    PSP's Products and System[1]

Pet Supplies Plus, a specialty pet food retailer, has 700 stores across the United States and 80 in Texas alone. In addition to carrying an extensive selection of name brand pet food and products, PSP has developed its own line of private label products, including proprietary pet food lines and pet supply lines that its customers have allegedly come to associate with its brand and stores. ECF No. 1 ¶ 13.

Over its more than 30 years of franchising and operating pet supply stores, PSP has also developed a comprehensive set of practices and procedures known as Standard Operating Procedures ("SOPs"). ECF No. 3-1, Declaration of Kenneth Miles Tedder ("Tedder Decl.") ¶ 3. The SOPs encompass every aspect of operating a PSP store, including inventory management, marketing, employee training suggestions, customer service, merchandising, and safety protocols. *Id.* The SOPs are a component of a larger system (the "System"), which includes:

(a)    uniform standards and specifications for providing pet products and self-service pet washing and grooming services for retail sale;

(b)    access to PSP's supplier networks;

(c)    specifications for a Store's interior and exterior construction, design, and layout;

(d)    specifications for furniture, fixtures, and equipment;

(e)    sales techniques;

(f)    merchandising, marketing, advertising, and inventory management systems; and

(g)    other general procedures for operating and managing a retail Store.

ECF No. 3-1, Ex. A-1, Recital C. The System also includes PSP's federally registered trademarks ("Proprietary Marks"), which PSP uses to identify its stores, products, supplies, and services. *See* ECF No. 1-3.

---

[1] Unless otherwise noted, these allegations are drawn from PSP's complaint, attachments to its motion, exhibits admitted at the evidentiary hearing on November 12 and 13, 2025, the preliminary injunction hearing transcript (ECF Nos. 41–43), and the parties' post-hearing briefing (ECF Nos. 45–46).

## II.    The Franchise and Guaranty Agreements

In April 2015, PSP and SureFed entered into a ten-year franchising agreement ("Franchise Agreement") under which Defendants opened a Pet Supplies Plus store at 5809 Babcock Road in San Antonio, Texas ("Babcock location" or "Competing Business"). *See* ECF No. 3- 1, Ex. A-1. On the same day, the Guarantors personally agreed to be jointly and severally bound to the terms of the Franchise Agreement. *Id.* at 63–64. Just over a year later, Defendants entered another franchise agreement with PSP to open a second Pet Supplies store at 12407 N Mopac Expressway, Suite 525-B, Austin, Texas 78758 ("Austin location"). The Austin agreement is not the subject of this preliminary injunctive request.

Under the San Antonio Franchise Agreement, PSP granted Defendants a non-exclusive license to establish and operate one Pet Supplies Plus store under PSP's System. *See id.* § 1.1. Defendants were also granted an exclusive territory: the area within a two-mile radius of the San Antonio store (the "Territory"). *Id.* § 1.2.

The Franchise Agreement gave Defendants the right to use PSP's Proprietary Marks, service marks, trade dress, logos, and other indicia of origin and access to PSP's confidential and trade secret information ("Confidential Information"), including the SOPs. *See id.* § 8.1.[2] PSP also provided Defendants with Confidential Information during various franchisee meetings hosted by PSP addressing business strategies, market analytics, and competitive planning materials. ECF No. 3-1, Tedder Decl. ¶ 10. PSP's Confidential Information was shared and discussed with Defendants at PSP's Leadership Summit, Quarterly Business and Marketing Calls, Franchisee Advisory

---

[2] "Confidential Information" includes "trade secrets, advertising strategies, price marketing mixes related to products and services offered by Stores, supplier networks and pricing arrangements with suppliers, sales promotion aids, business forms, merchandising procedures, accounting procedures, marketing reports, inventory systems, copyrighted materials, and other methods, techniques and know-how concerning the operation of the Store . . . including (i) current customer and prospective customer names and addresses, (ii) information about credit extensions to customers, (iii) customer purchasing histories, (iv) rates charged to customers, and (v) CRM reports."

Committee sessions, and regular meetings with SureFed's assigned District Team Leader. *See id.* A key purpose of the meetings was to equip franchisees with tools and strategies for gaining market share based on PSP's Confidential Information. *See id.*

In exchange for its access to PSP's System, Proprietary Marks, and Confidential Information, Defendants agreed to certain restrictions on competition after the termination of franchise relationship, set forth in Article XI of the Franchise Agreement.

**Section 11.1 Restrictions on Competition**

(b) **For a period of 2 years after the expiration, nonrenewal, transfer or termination of this Agreement**, regardless of the cause, **neither you nor your owners, officers, directors, principals**, Key Managers, nor any member of your immediate family or the immediate family of your owners, officers, directors, principals, and Key Managers who work at the business **may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation**:

[. . .]

(2) Own, maintain, engage in, be employed as an officer, director, or principal of, lend money to, extend credit to or have any interest in any other business or entity which operates or licenses others to **operate a business that derives 20% or more of its revenue from the sale of pet food, pet supplies, pets, pet grooming and bathing services, and any other products or services offered or authorized by PSP for sale by System franchisees** at the time this Agreement is terminated or otherwise expires and is not renewed: (i) **at the [San Antonio] Location premises**; (ii) within the Territory; or (iii) within a 5-mile radius of (a) the Territory being granted hereunder or (b) any other Territory licensed by PSP as of the date of expiration or termination of this Agreement;

(3) **Solicit the Store's customers or contact any of PSP's suppliers or vendors for any competitive business purpose**; or

(4) **Employ . . . any person who is at that time employed by** PSP or its affiliates or **any other franchisees**. . . .

*See* ECF No. 3-1, Ex. A-1, § 11.1 (emphasis added). Further, Section 11.5 of the Franchise Agreement includes a presumption that if Defendants operate a business that derives 20% or more

4

of its revenue from pets and pet-supplies-related products and services in the restricted area, then it is presumed that Defendants are using PSP's Confidential Information.

In agreeing to Article XI's restrictions on competition, SureFed acknowledged that such covenants were necessary to "protect the goodwill of the Store, other Pet Supplies Plus franchisees, and the Pet Plus System" and the Confidential Information provided to SureFed under the Franchise Agreement. *Id.* § 11.2. SureFed further acknowledged that "in the event of the actual or threatened breach of this Section 11, PSP's harm will be irreparable and that PSP has no adequate remedy at law to prevent such harm." *Id.* SureFed also agreed to "[i]mmediately discontinue use of the Proprietary Marks" upon expiration of the Franchise Agreement. *Id.* § 13.7(c).

The Guarantors likewise agreed that they would not breach any post-termination obligation arising under the Franchise Agreement and agreed to identical covenants against competition. ECF No. 3-1, Ex. A-1 at 62–67.

### III. Termination of Franchise Agreement, Expiration Notice, and PSP Bankruptcy

In March 2025, SureFed informed PSP that it was not interested in renewing the Franchise Agreement for the San Antonio store. *See* ECF No. 3-1, Ex. A-2 at 1 ("Expiration Notice"). SureFed asserts that there were "serious operational challenges" throughout its relationship with PSP, including PSP's repeated, targeted store audits that disrupted operations and its failure to deliver key products to Defendants' stores. *See* ECF No. 8-1, Barksdale Decl. ¶ 24.

Defendants characterize their PSP businesses as "a money pit," ECF No. 8 at 4. Between 2015 and 2016, Mr. Barksdale developed four PSP locations: three in San Antonio and one in Austin, which opened in January 2017. ECF No. 8-1, Barksdale Decl. ¶ 13. He also purchased the rights to develop an additional 14 locations in Texas. *Id.* ¶ 12. After operating the stores at net loss for some time, however, Mr. Barksdale believed that the financial forecasts in PSP's franchise

disclosures were misleading—underestimating the required initial investment and overestimating expected revenue. *See id.* ¶¶ 11–18. In 2017, he closed two of the San Antonio stores (after several attempts to sell them) and returned his remaining development rights to PSP. *See id.* ¶¶ 20–22. His operational challenges were allegedly exacerbated by PSP's bankruptcy filing in November 2024. *See* ECF No. 8 at 4; *id.*, Ex. A at 7 (first filing showing several key pet food suppliers (including Purina and Hill's Science Diet as unsecured creditors holding the largest claims against PSP's parent company, Franchise Group, and other debtors).

In spring 2025, the parties began discussing post-expiration options, including a possible purchase of the San Antonio franchise and assumption of the lease—by PSP or an outside buyer. *See* ECF No. 8-1, Barksdale Decl. ¶¶ 28–32; ECF No. 10 at 18. After several months without an agreement, PSP issued an Expiration Notice stating that it would cease performance under the expired Franchise Agreement on May 8, 2025. ECF No. 3-1, Tedder Decl. ¶ 8. The Expiration Notice also memorialized the consequences of termination, reminding Defendants of their post-termination covenants, including non-competition and confidentiality, and directing SureFed to immediately discontinue use of PSP's Proprietary Marks. *Id.* The Expiration Notice set forth a June 5, 2025, deadline for Defendants to de-identify the Babcock store. *Id.* at 2.

## IV.    PSP's Post-Termination Store Visit

On May 11, 2025, Alcides Segovia, a PSP District Team Leader, visited the San Antonio store and observed that, despite the Expiration Notice, Defendants were continuing to operate a pet supply store. ECF No. 3-2, Segovia Decl. ¶¶ 7–8. The "Pet Supplies Plus" sign was still displayed on the building façade, with no indication to customers that the store was no longer a PSP franchise. *Id.* ¶¶ 8–9; *see id.*, Ex. B-1. Defendants continued to use and display PSP's proprietary branded materials, including signage and window dressings with PSP trademarks, and

continued to sell PSP private-label pet food and supplies. *Id.* ¶¶ 8–9, 11; *see id.*, Ex. B-2; Ex. B-5. The store was selling only pets, pet foods, and pet supplies and did not offer any goods or services unrelated to pets. *See id.* ¶ 17.

During his visit, Mr. Segovia noticed several violations of the SOPs, including multiple empty racks and displays ("product holes") and dead fish in aquariums. *Id.* ¶¶ 10, 12; *see id.*, Exs. B-3, B-4. While waiting in line to purchase a can of PSP private label cat food, Mr. Segovia overheard customers complaining that they could not use their Pet Supplies Plus Rewards, PSP's customer loyalty program. *Id.* ¶ 13. At checkout, customers were presented with a flier stating "We're Having A Makeover" with a QR code that linked to a Google document soliciting customer information, product preferences, and contact details. *Id.* ¶ 15; *see id.*, Ex. B-6. After making a purchase, Segovia was given a receipt with the store name "Pets Plus." *Id.* ¶ 14; *see id.*, Ex. B-5.

## V.    Procedural History

PSP filed its original complaint on May 16, 2025, alleging that Defendants' conduct constitutes a material breach of the Franchise and Guaranty Agreements and willful trademark infringement under the Lanham Act. ECF No. 1. On the same date, PSP moved for emergency injunctive relief to prevent harm to its brand, reputation, and customer goodwill. ECF No. 3.

### A.    TRO Hearing and Order Granting Partial Relief

Defendants filed a response on May 29, 2025 (ECF No. 8), shortly before the Court's hearing. At the hearing, Defendants represented that the San Antonio store had been timely de-identified in accordance with the terms of the Expiration Notice—the store was no longer using or displaying PSP's proprietary branded materials, including signage or window dressings with PSP trademarks, or selling PSP private-label pet food and supplies. *See* ECF No. 8 at 2, 6–9 (explaining that the store was timely de-identified by May 19, 2025); ECF No. 8-1, Barksdale Decl. ¶¶ 41–

7

43.[3] Defendants also explained that the store had lost access to Plaintiff's customer lists and other Confidential Information on the Expiration Date. *See* ECF No. 8 at 14.

Because injunctive relief as to use of PSP's Proprietary Marks or customer lists would not prejudice Defendants, the Court issued an order from the bench enjoining Defendants from (1) using Plaintiff's Proprietary Marks and (2) using any customer lists prepared or maintained while the Franchise and Guaranty Agreements were in effect. *See* Text Order (June 3, 2025). The Court also directed Defendants to return to Plaintiff any electronic or hard copy versions of the SOPs, pricing sheets, market research, or other Confidential Information bearing on the San Antonio store received from Plaintiff while the Franchise and Guaranty Agreements were in effect. *See id.*

On October 25, 2025, the Court issued an order declining to extend the existing TRO to enjoin SureFed's operations at the Babcock location. *See PSP Franchising, LLC v. SureFed Plus, LC*, No. SA-25-CV-00544-XR, 2025 WL 3035112, at *6 (W.D. Tex. Oct. 20, 2025). The Court found that PSP is likely to succeed on the merits of its breach-of-contract claims, but "given the de-identification of the store and existing injunction, the Court [was] not convinced at [that] stage that permitting Defendants to continue operating the San Antonio store is likely to cause PSP irreparable harm." *Id.* at *10. The Court reasoned that:

- **Since the San Antonio store had been fully de-identified from PSP, the risk of ongoing confusion among PSP's past, current, and prospective customers was low.** Arguments addressing customer confusion between termination on May 8 and de-identification on May 19 bear on questions of causation and damages and are now moot as to PSP's request for emergency relief and otherwise premature.

- **Defendants were unlikely to secure an unfair competitive advantage in the San Antonio pet supplies market through their continued access to the SOPs and Confidential Information in the Austin location.** Mr. Barksdale represented that he intended to depart from PSP's System and return to his roots in farm animal supplies. PSP's Confidential Information (e.g., advertising strategies and market reports) had a limited shelf life, and it was unlikely that Defendants, as a small business, would be

---

[3] PSP filed suit on May 16, 2025—well before the June 5 de-identification deadline. *See* ECF No. 1.

able to use that information to undercut PSP's prices. In any event, such *economic* harm could be compensated under the damages formula in the Franchise Agreement.

- **PSP's fear that Defendants' continued operation would dissuade new franchisees from entering the San Antonio market was speculative**, given (1) Mr. Barksdale's plan to transition to selling animal supplies and (2) the recent bankruptcy of PSP's parent company.

*Id.* at *9–10. Finally, the Court held that the balance of equities and the public interest weighed against a temporary injunction, which would not only impose a substantial injury on Defendants but also close a local business and cost employees their jobs. *Id.* at *10–11.

### B.    Preliminary Injunction Hearing

Following limited discovery, the Court held an evidentiary hearing on PSP's motion for a preliminary injunction on November 13 and 14, 2025. At the hearing, the parties presented testimony and submitted exhibits concerning (1) their pre-termination discussions and considerations; (2) customer feedback about the Competing Business; (3) the marketing and operation of the Competing Business; (4) the financial state of the Competing Business; and (5) the status of PSP's franchise development in San Antonio.

**(1) Termination Discussions.** At the hearing, it became clear that SureFed and PSP had contemplated termination of the franchise relationship for some time. Indeed, it appears that, by September 2020, nearly two years after buying back Mr. Barksdale's development rights to 14 PSP stores, both parties were contemplating a buy-out option. In a letter to Mr. Barksdale's attorney, PSP's in-house counsel stated:

> Should your clients decide to terminate all three (3) of their current PSP franchise agreements and de-identify the stores, PSP is willing to discuss allowing your clients to exercise a buy-out of the post-term covenants against competition subject to the terms and conditions of an agreement that would include a mutual confidentiality provision. Please advise if you are interested in starting a conversation regarding this potential option.

*See* DEX-22. At the hearing, Mr. Tedder testified that, despite PSP's willingness to entertain a buy-out option, it would be subject to approval by PSP's board and would be difficult to price because PSP had "never done it before." ECF No. 41, Hr'g Tr. at 15:7–12. In any event, it seems that no such discussion ever occurred. Instead, in 2025, the parties turned their attention to a possible purchase of the San Antonio franchise and assumption of the lease (by PSP or an outside buyer) but did not reach an agreement.

When asked why he did not simply open a pet supply store in a location outside of the restricted territory to comply with his post-termination non-compete obligations, Mr. Barksdale testified that he was unaware of that option until his deposition in this case. ECF No. 41, Hr'g Tr. at 38:20–39:1. He admitted, however, that by the time the Franchise Agreement was terminated in May 2025, he lacked the financial ability to open a store at a new location. *Id.* at 39:9–13.

**(2) Customer Feedback.** At the hearing, PSP presented evidence of customer feedback about the Competing Store, as submitted to PSP and reviews of the Competing Business posted on Google. *See* PEX 21–23.

PSP identified a call to its customer service line on May 12, 2025—four days after the termination of the Franchise Agreement—from a customer who complained that employees at the San Antonio store would not accept his coupons or rewards because it was changing ownership. *See* PEX-21 at PSP0000476. He stated that, without PSP's coupons and rewards, he could only afford to buy one bag of dog food at full price (instead of his usual two). *Id.* He mentioned that he needed to save as much money as possible because he had Stage IV cancer, but he has a hard time driving to the other side of town to get to the nearest PSP store. *Id.*

Another customer called PSP's service line in October 2025 to report dead fish in the tanks at the Competing Business, stating that she "knows the sign says pets plus [sic] but is unsure if it's

still listed as Pets Supplies Plus. She checked a receipt and said that it just says Pet's Plus." *See* PEX-22 at PSP0000492.

Finally, PSP pointed to three undated reviews of Pets Plus on Google. In the first, a customer described store employees as "friendly and thoughtful," noting that she had been a store customer for years and that "the name may have changed, but the same great people are still here." PEX-23 at PSP0000873. She also noted that a groomer from the Austin store had come to San Antonio for the day and clipped her pet's nails. *Id.*

Not all reviews were glowing. A second reviewer complained that the "[n]ew management" was "trash," "rude[]," and "only care about getting your money." *Id.* at PSP0000874. A third stated:

> I was excited to go get some dog items and kitty litter for my cats. We found out that pet supply plus [sic] was now Pet Plus [sic]. The sign says same store new look. But I'd say it's not the same store. Prices increased and rude service. . . . It's a disappointment and left a bad taste in my mouth.

PEX-15 at PSP0000868.

**(3) Marketing and Operations.** Consistent with these customer reports, Defendant Victoria Barksdale ("Ms. Barksdale")—Mr. Barksdale's daughter and SureFed's operations manager acknowledged that, since the termination of the Franchise Agreement, the Competing Business has borrowed several employees from the Austin location, including a manager and a groomer. *See* ECF No. 41, Hr'g Tr. at 75:14–77:6, 112:25–113:25; PEX-23. Mr. Barksdale further acknowledged that the Competing Business generates approximately 95% of its revenue from the sale of pet supplies, despite earlier representations that SureFed intended to transition to selling farm animal supplies. *See id.* at 37:19–38:19.

After the San Antonio store was de-identified, "Pets Plus" installed signs around the Babcock location and posted to its social media pages describing the store's "rebrand," but

11

highlighting certain elements of continuity, including the location, employees, and management. *See* PEX-15 (banner outside of store characterizing Pets Plus as "YOUR SAME STORE, FRESH NEW LOOK"); *id.* (Facebook description of Pets Plus as "a family-owned specialty pet store, serving San Antonio for 10+ years"); PEX-16 (same).[4]

PSP also introduced evidence that the Competing Business has adopted promotional strategies similar to those developed under PSP's System, including holiday sales, in-store events, and self-serve dog washes. *See* ECF No. 46 at 18–21; PEX-29 (calendar of PSP events)

**(4) SureFed's Financial Status.** Mr. Barksdale also testified about the financial state of the Competing Business. SureFed has a business loan that is past due with an outstanding balance of $1.1 million. *See* ECF No. 41, Hr'g Tr. at 53:21–54:3; PX-7. Mr. Barksdale admitted that SureFed lacks the ability to pay off the balance if the bank seeks payment.[5] *Id.* at 53:21–54:3.

According to Mr. Barksdale, the Babcock location had never been profitable and acknowledged that sales at the Competing Business had consistently declined since the termination of the Franchise Agreement, from 130-150 customers per day, on average, to 60-70 customers. *See id.* at 40:24–41:3, 41:18–25, 47:18–22; PEX-3. He stated that, having spent approximately $300,000 since May 2025 to keep the Competing Business afloat, he would only inject another $150,000 into the business going forward. ECF No. 41, Hr'g Tr. at 45:1–7, 47:18–48:1.

**(5) Status of PSP Franchisees in San Antonio.** PSP complains that the Competing Business prevents it from bringing a new franchise into the area. *Id.* at 149:8–15.

---

[4] In October 2025, Pets Plus posted a flyer to its Facebook advertising a raffle for a $500 gift card to "Pet Supplies Plus," *see* PEX-18, which Ms. Barksdale conceded was a "misprint." ECF No. 41, Hr'g Tr. at 115:4–25.

[5] Mr. Barksdale also admitted that the commercial real estate he referenced as potential security for the debt in a September 2020 letter to the lender is no longer available as it has all been sold. *See* ECF No. 41, Hr'g Tr. at 4:4–17; PEX-7.

PSP has an existing franchisee, Max Pets, that secured the rights to open three PSP stores in the San Antonio area in February 2024. *Id.* at 149:16–152:18. Max Pets has signed leases for two locations and is currently building out those stores. *Id.* at 151:4–8; DEX-36. One is about 16 miles to the west of the Competing Business and the other is about six miles to the east. ECF No. 41, Hr'g Tr. at 151:9–14. At the hearing PSP's Chief Development and Stores Officer, Nick Russo, testified that if the Competing Business were not operating at the Babcock store, it would be "an attractive spot for Max Pets to put its third location." *Id.* at 151:15–18.

Both parties submitted post-hearing briefing. *See* ECF No. 45 (Defendants); ECF No. 46 (PSP). Considering the evidence and arguments submitted at the hearing and the parties subsequent briefing, the Court issues the following order.

## DISCUSSION

### I. Legal Standard

Under well-settled Fifth Circuit precedent, a preliminary injunction requires the movant to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

### II. Analysis

#### A. PSP has a high likelihood of succeeding on the merits

As the Court has noted, PSP has a high likelihood of succeeding on the merits of its breach-of-contract claim because Defendants have continued to operate a pet supply store at the San Antonio store after the expiration of the Franchise Agreement, in violation of their non-compete and post-termination obligations under the Franchise and Guaranty Agreements. *See* ECF No. 3-

13

1, Ex. A-1, § 11.1(b). Despite representations earlier in this litigation that they planned to sell farm animal supplies, Mr. Barksdale testified at the preliminary injunction hearing that the Competing Business generates approximately 95% of its revenue from the sale of pet supplies. *See* ECF No. 46 at 16 n.5. The Competing Business may also have violated the non-compete agreement by borrowing several employees from the Austin location. *See* ECF No. 3-1, Ex. A-1, § 11.1(b)(4); PEX-23; ECF No. 41, Hr'g Tr. at 75:14–22, 112:25–113:25.

**B.    PSP has not established a likelihood of irreparable harm**

"A court may only issue injunctive relief if irreparable harm is 'likely'; granting an injunction based on a mere possibility of remote injury is insufficient, even if a [movant] has shown a nearly certain likelihood of success." *Six Kingdoms Enters., LLC v. City of El Paso*, No. EP-10-CV-485-KC, 2011 WL 65864, at *9 (W.D. Tex. Jan. 10, 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)). "Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

To establish irreparable harm, a party must demonstrate a "significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) ("[A] harm is irreparable where there is no adequate remedy at law, such as monetary damages.").

Courts have held that "a finding of irreparable harm is appropriate even where economic rights are involved when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d

806, 810 n.1 (5th Cir. 1989) (quotation omitted); *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 848 (5th Cir. 2004) ("[A] plaintiff can prove there is no adequate remedy at law where damages cannot be calculated."). Injury to a party's reputation or goodwill is often considered an irreparable harm. *Doe v. Tex. Christian Univ. & Victor J. Boschini*, 601 F. Supp. 3d 78, 95 (N.D. Tex. 2022). On the other hand, courts have found that loss of market share, loss of future market opportunities, and loss of first-to-market opportunities do not constitute irreparable harm. *See, e.g.*, *Pruvit Ventures, Inc. v. Forevergreen Int'l, LLC*, No. 4:15-cv-571-ALM-CAN, 2015 WL 9876952, at *3 (E.D. Tex. Dec. 23, 2015).

In short, PSP bears the burden of "demonstrat[ing] that monetary damages are an insufficient remedy and that [its] alleged harms are not just possible, but *likely*." *Id.*

### 1.    The Franchise Agreement does not itself establish irreparable harm

Defendants have expressly acknowledged in their respective contracts that PSP has no adequate remedy for its breach of the non-compete.[6] That evidence alone does not fulfill PSP's burden on this prong, however, as such stipulations are "insufficient by themselves to support a finding of irreparable harm to support injunctive relief." *Hartford Fire Ins. Co. v. 3i Constr., LLC*, No. 3:16-CV-992-M, 2017 WL 3209522, at *2 (N.D. Tex. May 18, 2017).

For their part, Defendants assert that PSP's willingness to discuss a buyout of their non-compete obligations "demonstrates, undisputably, that PSP did not view any harm deriving from a breach of the non-compete as irreparable, but rather monetary in nature." ECF No. 45 at 5 (citing *Tactic Franchising, LLC v. 100 Percent Chiropractic Ryan, LLC*, No. 25-cv-88-GPG-MDB, 2025 WL 1251260, at *2 (D. Colo. Jan. 15, 2025) (reasoning that a franchise agreement that permits

---

[6] *See* ECF No. 3-1, Ex. A-1, § 11.2 ("You agree that in the event of the actual or threatened breach of this [non-compete], PSP's harm will be irreparable and that PSP has no adequate remedy at law to prevent such harm."); *id.* at 64 (same for Guarantors).

franchisees to buy out their non-compete obligations suggests that the franchisor does not view the potential harms from competition with former franchisees as irreparable). While the Court finds some merit in this point, the parties did not ultimately execute a buyout agreement, which would have been "subject to terms and conditions[,] includ[ing] a mutual confidentiality provision." *See* DEX-22. In addition to confidentiality, the buyout agreement might have imposed conditions intended to avoid some of the irreparable harm alleged here from the start (by, e.g., requiring certain messaging and signage about the termination of the franchise).[7] Thus, PSP's willingness to discuss a buyout option is not dispositive evidence that PSP views the potential harm from violation of the non-compete provision as economic.

PSP asserts that "Texas courts . . . have consistently held that 'injury resulting from the breach of non-compete covenants is the epitome of irreparable injury.'" ECF No. 46 at 4 (quoting *WorldVue Connect Glob., LLC v. Szuch*, 155 F.4th 472, 485 (5th Cir. 2025) (citing *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996)).[8] While the Franchise Agreement is governed by Michigan law, PSP insists that "[t]he result is the same [in either state] because both Texas and Michigan law analyze the reasonableness of post-termination non-competes using materially similar factors and enforce such covenants where, as here, they are reasonable in scope and necessary to protect legitimate business interests." *Id.* at 4 n.2. But the question at hand is not whether the non-compete is enforceable; the question is how it should be enforced at this stage of the litigation. To justify a preliminary injunction, PSP must demonstrate

---

[7] It's also notable that PSP's invitation extended to all three of SureFed's remaining franchise locations, suggesting that one non-economic condition of the buyout would be termination of SureFed's business relationships with PSP. *See* DEX-22.

[8] *Also citing Henson Patriot Ltd. Co., LLC v. Medina*, No. SA-14-CV-534-XR, 2014 WL 4546973, at *4 (W.D. Tex. Sep. 11, 2014) (citation omitted) ("breach of a non-compete is the epitome of irreparable injury, so enforcement appears to be the rule rather than the exception"); *Pizza Hut LLC v. Pandya*, No. 4:19-CV-726-RWS, 2019 WL 8331437, at *3 (E.D. Tex. Nov. 26, 2019) (citation omitted) ("As courts in this district have found, violations of a non-compete agreement are the epitome of irreparable injury.").

"a significant threat" of imminent, irreparable injury unless the Competing Business's operations are enjoined. *Humana*, 804 F.2d at 1394. The Court will not adopt a rule that the breach of a non-compete provision in a franchise agreement constitutes *per se* evidence of irreparable harm. Instead, the Court must consider actual evidence that PSP will be irreparably harmed by Defendants' operation of the Competing Business in the context of this case.

### 2. PSP's theories of irreparable harm

PSP's arguments center on four main categories of irreparable harm: (a) Defendants' alleged misuse of PSP's confidential information; (b) the possibility of customer confusion, (c) PSP's alleged inability to refranchise the Babcock location to another franchisee; and (d) Defendants' alleged inability to satisfy a monetary judgment.

### a. SureFed's access to PSP's Confidential Information in Austin

PSP's fear that the Defendants' knowledge of and, through its Austin location, access to the SOPs and Confidential Information will give them an unfair advantage in the San Antonio market seems unfounded, for several reasons.

First, consider PSP's suggestion that SureFed could have simply opened a pet supply store at a new location outside the restricted area (e.g., somewhere beyond a seven-mile radius of the Babcock location and a five-mile radius of any other PSP location) to avoid violating the Franchise Agreement. ECF No. 3-1, Ex. A-1, § 11.1(b)(2). Even under that counterfactual, SureFed would retain access to PSP's Confidential Information through the Austin store. In other words, even compliance with the terms of the non-compete would not protect PSP from the species of competitive harm it purports to suffer here. It follows that this harm has not been caused merely by SureFed's continued access to PSP's Confidential Information.

While there is some similarity in certain promotions and engagements strategies deployed by Pet Plus to those required under PSP's System, PSP itself acknowledges that the events, promotions, and services are not unique to PSP. *See* ECF No. 46 at 19–21. Rather, it insists that PSP has conducted detailed performance analyses demonstrating how these events and strategies drive customer acquisition, retention, reactivation and increase sales. *Id.* at 18–20. But PSP has not proffered any evidence that SureFed relied specifically on this Confidential Information to plan its events and promotions at the Babcock store.

Finally, if PSP is convinced that Defendants' continued access to the Confidential Information through its Austin franchise, the Franchise Agreement provides a simple solution in light of SureFed's breach: terminate the Austin franchise. The Franchise Agreement permits termination with notice (but without an opportunity to cure) if SureFed or any of its principals "materially breach any other agreement with PSP" or "materially violate any provisions . . . pertaining to the Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information." ECF No. 3-1, Ex. A-1, § 13.2(f), (g). Indeed, on May 5, 2025, PSP issued a notice to SureFed warning that the Austin franchise agreement was subject to termination based on SureFed's breach in San Antonio. *See* PEX-28 (citing a flyer informing customers about a store "makeover" that was distributed at the Babcock store as evidence that SureFed intended to discontinue operating the store as a PSP franchise). Despite this threat, PSP has not terminated the Austin agreement and instead continues to collect royalties from the Austin location.

### b.    Customer confusion and harm to PSP's brand and reputation

Citing several customer complaints about the Competing Business, PSP asserts that Defendants' continued operation of a pet supplies store at the Babcock location is creating

confusion among PSP's past, current, and prospective customers and damaging the value of PSP's brand, goodwill, and reputation. ECF No. 46 at 5–10.

As the Court has already explained, arguments addressing customer confusion between termination on May 8 and de-identification on May 19 bear on questions of causation and damages. *PSP Franchising*, 2025 WL 3035112, at *9. Causation issues are especially salient for this period because PSP (1) posted a coupon on the Instagram page for the Babcock store the day *after* the termination of the Franchise Agreement, *see* DEX-24, and (2) continued to list the Babcock location on its website for at least 20 days after issuing the termination notice, *see* DEX-14. While PSP blames any customer confusion on the fact that the store was still operating, "it is not clear to the Court how a website directing customers to a *closed* location would be better for PSP's reputation than directing customers to an *underperforming* location—either scenario would be confusing and frustrating for customers." *PSP Franchising*, 2025 WL 3035112, at *9 (emphasis in original). Thus, the May 12, 2025 customer complaint to PSP that the Babcock store would not accept his coupons proves the point. *See* PEX-21 at PSP0000476. Assuming the truth of the complaint, it seems that the customer, who had difficulty driving across town to get to the nearest PSP location, would have been equally if not more frustrated under PSP's preferred counterfactual, in which he would have driven to the Babcock store, found it closed, and been forced to either drive across town to use his coupons or forego buying dog food altogether. *Id.*

As to the Google reviews of Pets Plus discussed at the hearing, it is impossible to fully evaluate their import without knowing *when* they were posted. Still, the very fact that the customers posted reviews on the *Pets Plus* page—rather than a PSP page—suggests that the customers were able to distinguish between the two businesses. *See* PEX-15 at PSP0000868; PEX-23 at PSP0000873. Similarly, even in the call to PSP's service line in October 2025 reporting dead

fish at the Competing Business, the caller was aware that both the sign on the building façade and the receipt identified the store as "Pets Plus." *See* PEX-22 at PSP0000492; *see also 7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (Nov. 20, 2014) (finding that franchisor would not suffer irreparable harm to its goodwill in the community if the court denied a preliminary injunction enforcing the noncompete, reasoning that "[c]ustomers would have no reason to associate Defendants' convenience store with the 7-Eleven brand after 7-Eleven's marks are removed from the premises"). While Plaintiff asserts that Defendants named the Competing Business "Pets Plus" to "intentionally evok[e] PSP to further capitalize on the goodwill built over more than ten years as a Pet Supplies Plus franchise," ECF No. 46 at 2, it does not allege that the name "Pets Plus" is so similar that it infringes on PSP's Proprietary Marks, *see* ECF No. 1 ¶¶ 53–60.

Finally, PSP objects to SureFed's "knowing and intentional misrepresentations to the public seeking to impermissibly capitalize on the goodwill built off the former Pet Supplies Plus franchise." ECF No. 46 at 10–14. But, in the Court's view, characterizing SureFed's messages to San Antonio customers as "misrepresentations" overstates the case. Indeed, insofar as they highlight certain elements of continuity between the PSP franchise and Pets Plus—i.e., that Pets Plus would operate from the same location, with the same staff and management—the content in the messages appears to be factually accurate. *See* PEX-15 (banner outside of store characterizing Pets Plus as "YOUR SAME STORE, FRESH NEW LOOK").

Similarly, PSP complains that the description of Pet Plus on Facebook and Yelp as "a family-owned specialty pet store, serving San Antonio for 10+ years" is "false—Pets Plus has not served San Antonio . . for over ten years - PSP has." ECF No. 46 at 11 (quoting PEX-15); *see also* PEX-16 ("serving San Antonio and Austin for 10+ years"). To be sure PSP "served" the San Antonio location for a decade, but it did so *through* SureFed, a family-owned business. SureFed,

20

still a family-owned business, now seeks to continue serving the same location *as* Pets Plus. Plaintiff's position—that any representation of continuity at the Babcock store necessarily invokes PSP's brand and that any goodwill accrued at the store is attributable PSP alone—defies both the evidentiary record, which suggests that location and personnel are both important to customers,[9] and common sense.[10]

### c.     Purported harm to PSP's franchise in the San Antonio market

PSP asserts that it has been irreparably harmed by Defendants' violation of the non-compete because it (i) has resulted in lost sales and (ii) prevented the PSP from developing new franchise locations in San Antonio. ECF No. 46 at 14–17.

### i.   Lost sales

In support of its argument that "PSP has suffered and will continue to suffer lost sales due to the existence of the Competing Business," PSP points to evidence of decreased sales at the Babcock location itself. *See id.* at 14. While the Babcock store has lost about half of its average daily customers since the termination of the Franchise Agreement, *see* ECF No. 41, Hr'g Tr. at 41:18–42:2, it is unclear to the Court how diminishing sales at the Competing Business evince a loss to PSP.

After all, in PSP's preferred counterfactual—in which the Babcock location is closed—former customers would simply take their business to another PSP location in the San Antonio area, resulting in a commensurate *increase* in sales at the other locations. It is possible that the

---

[9] *See, e.g.*, PEX-21 at PSP0000476 (customer found it difficult to drive to another PSP location); PEX-23 at PSP0000873 ("the name may have changed, but the same great people are still here").

[10] Consider PSP's proposal that Defendants simply open a new store outside the restricted territory. Surely, Defendants would be permitted—if not required—to advertise their experience in the industry without reference to PSP. (After all, Plaintiff would presumably object to any mention of Defendants' previous relationship with PSP as an impermissible attempt to capitalize on its goodwill. *See* ECF No. 46 at 10.). Under PSP's theory of noncompetition, a physician who opened a new practice after working at the same hospital for 30 years would be required to (mis)represent herself as fresh out of medical school.

Babcock location has lost customers precisely *because* those customers have started shopping at other PSP stores in the area. Moreover, while SureFed has lost access to the customer data it collected as a PSP franchisee, that information is presumably still available to PSP itself. Thus, an expert should be able to use PSP's customer and sales data to calculate a damages *ceiling* by identifying former customers at the Babcock franchise who have started shopping at other PSP stores in the area.

Acknowledging that lost sales constitute economic damages, PSP insists that they are nonetheless irreparable because "the scope of the lost sales and customers are impossible to calculate." ECF No. 46 at 14. PSP asserts that "SureFed has admitted that it would be impossible to identify which of its current customers were also customers of the former franchise . . . [and] even if those customers could be identified, it is still not possible to calculate the extent of lost past and future sales attributable to those customers with any certainty." *Id.* at 14–15.

While lost profits "cannot be based solely on mere conjecture or speculation," "mathematical certainty is not required." *Bonelli v. Volkswagen of Am., Inc.*, 166 Mich. App. 483, 511 (1988). Indeed, economic damages are often based on estimates and calculated indirectly. *See, e.g.*, *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 345 (6th Cir. 2018) ("At least one Michigan court has determined that testimony related to market share can help quantify lost profits with sufficient certainty." (citing *Fabbrini Fam. Foods, Inc. v. United Canning Corp.*, 90 Mich. App. 80, 280 N.W.2d 877, 880 (1979) (per curiam) (concluding that accountant's analysis of decrease in both gross profits and market share was sufficiently concrete proof of lost profits)); *Joerger v. Gordon Food Serv., Inc.*, 224 Mich. App. 167, 176, 568 N.W.2d 365, 370 (1997) ("Several cases have allowed a party to prove loss of future profits by pointing to profits

22

made in previous months or years." (collecting cases)).[11] The fact that PSP has yet to develop a more fulsome model for estimating sales lost to the Competing Business does not suggest that such damages are impossible to calculate, especially at this stage of litigation.

### ii.    Harm to existing and future PSP franchisees

PSP asserts that the Competing Business prevents franchisees from establishing additional stores in the San Antonio area. But "[w]hether [PSP] can protect future unascertainable franchisees and each of their territories has no bearing on whether [PSP] will suffer immediate irreparable harm in this case." *See VetCheck v. Hartley-Thomas Grp., LLC*, No. 1:24-cv-709-TWP-MJD, 2025 WL 860110, at *4 (S.D. Ind. Mar. 18, 2025) (denying franchisor's request for a preliminary injunction because the franchisor had failed to show irreparable harm). "It is not enough to argue that some unascertainable future franchisee may not want to enter into an agreement or may breach an agreement if the Court doesn't grant a preliminary injunction." *Id.* at *5–6.

PSP further asserts the Defendants' operations have harmed its existing franchisee, Max Pets. But Max Pets signed its development agreement for three San Antonio locations in February 2024, when Defendants were still operating the Babcock store as a PSP franchise. In other words, at signing, Max Pets was aware of SureFed's presence at the Babcock store, which is located, by definition, outside of Max Pets' protected territories. *See* DEX-36–39. Indeed, the development agreement map *expressly excludes* the Babcock location from Max Pets' development area. DEX-37 at 9. Thus, at signing, Max Pets could not have expected to develop a store at the Babcock location and cannot, as a practical matter, show that it has been harmed by Defendants' conduct.

---

[11] *See also SW Battery Corp. v. Owen,* 131 Tex. 423 (1938) ("The requirement of 'reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise."); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex. 1992) ("What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.").

Together, PSP's theories of lost profits and harm to future franchising prospects are premised on a faulty counterfactual, one that assumes PSP is entitled to continue operating from the Babcock location through another franchisee. But PSP has no right to conduct business from the premises, given that SureFed still holds the lease. *See* ECF No. 8-1, Barksdale Decl. ¶ 56.

Rather, the proper counterfactual—the relief PSP purportedly seeks in its motion—is closing the Babcock location altogether. That relief would inevitably limit the monetary damages available to PSP given that (1) its royalties under the Franchise Agreement are calculated as a percentage of gross revenue, ECF No. 3-1, Ex. A-1, § 4.2; and (2) cutting off the Competing Business's revenue will limit the funds available to SureFed to pay an award of damages. Given these financial consequences, without clear evidence of irreparable harm, it would seem to be in PSP's interest to allow the Babcock location "to continue operation pending resolution of the merits of [its] claims because this would maximize the ultimate damage awarded." *Fetch! Pet Care, Inc. v. Atomic Pawz Inc.*, No. 25-CV-11568, 2025 WL 1921753, at *13 (E.D. Mich. July 11, 2025). Indeed, despite SureFed's breach of the San Antonio Franchise Agreement, PSP has not terminated SureFed's Austin franchise.

Cast in this light, PSP's arguments suggest that, at bottom, their request for injunctive relief is focused not on competition for customers but competition for real estate. Despite repeatedly suggesting that SureFed should simply open a new business outside the restricted area, *see, e.g.*, ECF No. 46 at 25, PSP has itself had difficulty finding suitable locations for new franchisees in the San Antonio area and acknowledged that Defendants' decision to retain the Babcock lease has further limited its options, *see* ECF No. 10 at 14–16. At the hearing, Mr. Russo testified that if the Competing Business were not operating at the Babcock store, it would be "an attractive spot for Max Pets to put its third location." ECF No. 41, Hr'g Tr. at 151:15–18. The Court does not doubt

that the Babcock store would be convenient location for a new PSP franchise, given that it has already been built out to PSP's specifications and fits within the geographical limits of its existing franchise network. But injunctive relief is meant to protect the moving party from irreparable harm, not to secure leverage in real estate negotiations.

### d.    Defendants' purported inability to pay damages

Finally, PSP asserts that "[e]ven if [its] damages were subject to some monetary calculation, Defendants' testimony makes clear that they would be unable to satisfy a monetary judgment, leaving PSP without an adequate remedy at law." ECF No. 46 at 21–22 (citing *Tex. Indus. Gas v. Phx. Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("For the purposes of injunctive relief, there is no adequate remedy at law . . . if the defendant is incapable of responding in damages.").

As evidence of Defendants' inability to pay a damages award, PSP cites (1) SureFed's past-due business loan in the amount of $1.1 million; (2) the Competing Business's declining sales and historic lack of profitability; and (3) Mr. Barksdale's testimony that he has spent $300,000 to keep Competing Business afloat since May 2025 and would spend no more than $150,000 on the San Antonio store going forward. *Id.* at 22–23.

PSP's theory that Defendants cannot satisfy an award of damages disregards the joint and several personal liability imposed on the guarantors under the Guaranty for "any indebtedness to PSP or its affiliates of Franchisee arising under or by virtue of the aforesaid Franchise Agreement." ECF No. 3-1, Ex. A-1 at 62. PSP has not proffered any evidence that the guarantors—William W. Vernon, Sr., William W. Vernon, Jr., Katherine Barksdale, and Emmadell Vernon—would be unable to pay an award of damages for SureFed's breach of the non-compete provision, and thus has not established that equitable relief is warranted on that basis.

### 3. Contractual remedies cannot be punitive

In seeking to demonstrate the irreparable harm it will suffer absent an injunction, PSP's brief repeatedly points to the alleged *willfulness* of Defendants' misconduct. *See, e.g.*, ECF No. 46 at 1 ("When the Franchise Agreement expired, SureFed made a *calculated choice* not to renew." (emphasis added)); *id.* at 1–2 ("a blatant and knowing violation of its covenant not to compete").[12] "Anything less [than injunctive relief]," PSP argues, "would *reward* Defendants' deliberate breaches and send a message to other franchisees that non-competes may be ignored without consequence." *Id.* at 2 (emphasis added). The Court is not persuaded by this line of reasoning, for at least two reasons.

To begin, courts in Michigan (and Texas) generally recognize that, absent evidence of independent tortious conduct, that relief awarded breach-of-contract cases must serve a remedial purpose rather than a punitive or deterrent function. *See Am. Cent. Corp. v. Stevens Van Lines, Inc.*, 103 Mich. App. 507, 515 (1981). Thus, equitable relief too must be granted to prevent irreparable harm and protect legitimate interests, not to punish wrongdoers.

Second, even without injunctive relief, it is hardly the case that Defendants' breach has been or will be free of consequences. In addition to their own attorneys' fees, Defendants are likely—given PSP's near certainty of success on the merits—to be responsible for both monetary damages and, under the Franchise and Guaranty Agreements, PSP's attorneys' fees. ECF No. 3-1, Ex. A-1, § 16.12; *id.* at 61 (Guaranty).

If SureFed intends to open a second Pets Plus at its Austin location upon the termination of that franchise agreement, *see* ECF No. 46 at 2, another expensive litigation is sure to follow.

---

[12] *See also* ECF No. 46 at 2 ("Only after PSP filed this lawsuit did SureFed 'de-identify' the Competing Business. Even then, SureFed chose the remarkably creative name of PetS Plus for their Competing Business, *intentionally* evoking PSP to further capitalize on the goodwill built over more than ten years as a Pet Supplies Plus franchise.") (emphasis added).

*See Fetch!*, 2025 WL 1921753, at *11 (citing *Pirtek USA, LLC v. Zaetz*, 408 F. Supp. 2d 81, 86 (D.C. Conn. 2005) ("A denial of this preliminary injunction will not encourage other franchisees that they can abandon their franchise agreements as they may be held liable for doing so")). To the extent that discouraging similar breaches by other franchisees is a permissible goal, the Court has no reason to believe (and no evidence before it) that the threat of prolonged and expensive litigation will not adequately serve that end. Moreover, Defendants and this Court have observed, the Franchise Agreement itself grants PSP the right to impose unilateral "consequences" for SureFed's breach by terminating the Austin franchise. ECF No. 3-1, Ex. A-1, § 13.2(f), (g). PSP has not, thus far, exercised that option.

In sum, the Court finds that, while PSP is likely to succeed on its breach-of-contract claim, it has not established that it is likely to suffer irreparable harm if Defendants' operations are not enjoined. "The Court ultimately concludes that Plaintiff has not established irreparable injury because (1) much of the damage here has already been done and (2) any future loss to goodwill or fair competition is too speculative." *Fetch!*, 2025 WL 1921753, at *11; *see also 7-Eleven*, 60 F. Supp. 3d at 282 ("[T]hough the court acknowledges 7-Eleven's restrictive covenant will probably be deemed enforceable, it is not clear that delaying the enforcement of this covenant will cause 7-Eleven irreparable harm.") (citing *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based *only on a possibility* of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") (emphasis added)).

## III.     Balance of the Hardships and Public Interest

Courts have recognized that the damage an injunction might cause a nonmoving party may be outweighed by the threat of an ineffective remedy for the plaintiff. *See, e.g.*, *BAC Home Loans*

*Servicing, LP v. Tex. Realty Holdings, LLC*, No. H-09-2539, 2010 WL 3522981, at \*13 (S.D. Tex. July 6, 2010) (citing *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 687 (5th Cir. 1980)).

Requiring Defendants to cease operations will impose a substantial injury. *See Bennigan's Franchising Co., L.P. v. Swigonski*, No. CIVA 3:06CV2300G, 2007 WL 603370, at \*5 (N.D. Tex. Feb. 27, 2007) ("If the plaintiffs' motion for injunctive relief is granted, the defendants will be forced to close the restaurant. This is a substantial injury."). On the other hand, as the Court has explained, PSP has not met its burden of showing, at this stage, that it is *likely* to suffer irreparable harm in the absence of an injunction. "[T]o the extent that either Plaintiff or Defendants will suffer hardship depending on the Court's decision, the harm to Defendants—the loss of their entire business and, for many, their entire source of income, as well as the termination of all their employees—is greater than that to Plaintiff." *Fetch!*, 2025 WL 1921753, at \*12.

Similarly, while "[i]t is in the public interest to uphold contracts," *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 571 (S.D. Tex. 2014), an injunction would appear to disserve the public interest because it would close a local business and cost Defendants' remaining employees their jobs. *See Bennigan's*, 2007 WL 603370, at \*5 (finding that the public interest weighed *against* an injunction that prohibited the franchisees from operating or having any involvement with casual dining or other restaurant businesses in part because "the [defendant] restaurant would be forced to close and a number of employees would lose their jobs").

## CONCLUSION

Plaintiff's application for a preliminary injunction (ECF No. 3) is **GRANTED IN PART** and **DENIED IN PART**.

As previously stated in open court, Defendants remain **ENJOINED** at the San Antonio Location from (1) using Plaintiff's Proprietary Marks or (2) using any customer lists prepared or maintained while the Franchise and Guaranty Agreements were in effect.

Plaintiff's motion is otherwise denied in all respects without prejudice to re-urging on summary judgment or at trial.

It is so **ORDERED**.

**SIGNED** this 18th day of March, 2026.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE